IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANDRA LETHGO, on behalf of herself and all similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CP IV WATERFRONT, LLC dba KAPILINA BEACH HOMES; GREP SOUTHWEST, LLC; and DOE DEFENDANTS 1-10,<br><br>Defendants. | CIVIL NO. 22-00052 JAO-WRP<br><br>ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR REMAND |

**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR REMAND**

This putative class action arises from the fuel leaks from the United States Navy's (the "Navy") Red Hill Bulk Fuel Storage Facility, which contaminated water distributed through the Navy's Joint Base Pearl Harbor-Hickam Water system and supplied to homes leased by Plaintiff Andra Lethgo ("Plaintiff") and others (collectively, "Plaintiffs") in the Kapilina Beach Homes residential community. Defendants CP IV Waterfront LLC dba Kapilina Beach Homes ("Kapilina") and GREP Southwest, LLC ("GREP") (collectively, "Defendants") removed this action from state court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and the federal officer removal statute, 28 U.S.C.

§ 1442.  ECF No. 1.  Plaintiff moves to remand, requesting that the Court reject removal based on the federal officer removal statute, allow jurisdictional discovery regarding citizenship to determine whether remand is required under CAFA, and defer ruling on CAFA removal until jurisdictional discovery is conducted.  ECF Nos. 12, 20.

For the following reasons, the Court GRANTS IN PART Plaintiff's Motion for Remand.  ECF No. 12.

## BACKGROUND

### I. Factual History

Kapilina is the landlord and GREP is the property manager for the Kapilina Beach Homes residential community at Iroquois Point.  ECF No. 1 at 3.  On May 6, 2011, Kapilina's predecessor in interest entered into an Amended and Restated Real Estate Ground Lease with the United States, acting by and through the Navy ("Ground Lease").  ECF No. 19 at 12.  The Ground Lease required the lessee to obtain utilities and services:

> The Lessee will be responsible for obtaining all appropriate and necessary utilities and services for the Premises. Lessee agrees to pay on a timely basis the costs of all such utilities and services.  Lessee may obtain such utilities and services from any private or municipal supplier who is able to deliver such utilities and services to the Premises.  If Lessee desires the Government to furnish to the Lessee for the Premises those utilities maintained as of the Commencement Date by the Government for the Premises, Lessee and Government must first execute a separate utilities services contract; absent the execution

> of such a contract, Government will have no obligation to provide utility services and, upon the execution of such a contract, the Government's obligations to provide utilities shall be only as specifically provided therein.

ECF No. 19-4 ¶ 19. Kapilina and the Navy subsequently entered into a Utility Sales Agreement dated September 26, 2012, pursuant to which Kapilina agreed to purchase electricity, potable water, and wastewater services from the Navy. ECF No. 19-3.

In November 2021, fuel leaks from the Red Hill Bulk Fuel Storage Facility contaminated the potable water supplied to Plaintiffs' communities, thereby causing the forced eviction of thousands of occupants and tenants of the communities. ECF No. 1-4 ¶¶ 5, 21. Plaintiffs accuse Defendants of having knowledge of the risk of contamination from Red Hill and failing to sufficiently protect the water supply from fuel contamination. *Id.* ¶¶ 16, 20.

On January 4, 2022, Plaintiffs commenced this action in the Circuit Court of the First Circuit, State of Hawaiʻi. ECF No. 1-3. They filed a First Amended Class Action Complaint ("FAC") on January 24, 2022, asserting claims for breach of contract; breach of implied warranty of habitability; breach of the Landlord Tenant Code, Hawaiʻi Revised Statutes ("HRS") Chapter 521; unfair and deceptive trade practices/unfair methods of competition, HRS Chapter 480; nuisance; wrongful eviction; and trespass. ECF No. 1-4.

## II.  Procedural History

Defendants removed this case on February 2, 2022, invoking CAFA and the federal officer removal statute as bases for jurisdiction.  ECF No. 1.  With respect to CAFA, Defendants submit that minimal diversity exists between the parties, there are more than 100 members — and likely thousands — in the putative class, and the amount in controversy exceeds $5,000,000.  *Id.* at 4–11.  Defendants allege that the case is removable under the federal officer removal statute because they leased and managed residential units pursuant to agreements with the Navy.  *Id.* at 11–12.

On February 9, 2022, Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint.  ECF No. 6.  The Court terminated the Motion to Dismiss without prejudice to refiling if the case remains in federal court.  ECF No. 17.

On March 2, 2022, Plaintiff filed the present Motion for Remand.  ECF No. 12.  Defendants filed an Opposition on April 8, 2022.  ECF No. 19.  On April 22, 2022, Plaintiff filed a Reply.  ECF No. 20.

On May 20, 2022, the Court held a hearing.  ECF No. 21.

## LEGAL STANDARD

Under 28 U.S.C. § 1441, a defendant may remove a civil action brought in a state court to federal district court if the district court has original jurisdiction.  *See Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 679–80 (9th Cir. 2006) (footnote

and citation omitted). "Removal . . . statutes are 'strictly construed,' and a 'defendant seeking removal has the burden to establish that removal is proper and any doubt is resolved against removability.'" *Hawaii v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1034 (9th Cir. 2014) (citation omitted); *see Hunter v. Phillip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009) ("The 'strong presumption against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper,' and that the court resolves all ambiguity in favor of remand to state court." (citation omitted)). Courts should presume that a case lies outside the limited jurisdiction of the federal courts. *See id.*

By contrast, the federal officer removal statute, 28 U.S.C. § 1442, is interpreted "broadly in favor of removal." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006). "[R]emoval rights under section 1442 are much broader than those under section 1441." *Id.* at 1253.

"If a case is improperly removed, the federal court must remand the action because it has no subject-matter jurisdiction to decide the case." *Dennis v. Hart*, 724 F.3d 1249, 1252 (9th Cir. 2013) (internal quotation marks and citation omitted).

## DISCUSSION

Plaintiff asks the Court to: (1) reject removal based on § 1442 and (2) permit jurisdictional discovery and defer ruling on CAFA jurisdiction until jurisdictional discovery is completed. ECF No. 20 at 4, 10.

### I.  Federal Officer Removal

Section 1442 authorizes "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office" to remove a state court civil action to federal court. 28 U.S.C. § 1442(a)(1). Whether a defendant was "'acting under' a federal officer . . . 'must be liberally construed' in favor or removal." *Stirling v. Minasian*, 955 F.3d 795, 800 (9th Cir. 2020) (some internal quotation marks and citation omitted). To establish the propriety of removal, a removing defendant must satisfy the following test: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1004 (9th Cir. 2021) (some internal quotation marks omitted) (quoting *Durham*, 445 F.3d at 1251).

As corporations, Defendants are "persons" for the purposes of § 1442(a)(1).  *See Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (citation omitted); *see also* 1 U.S.C. § 1 (including in the definition of "person" "corporations, companies, associations, [and] individuals").  The parties dispute Kapilina's satisfaction of the second and third requirements, which Defendants must prove are factually supported by a preponderance of the evidence.  *See Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022) (citation omitted).

**A.     Causal Nexus**

Defendants argue that there is a causal connection between Kapilina's actions taken pursuant to its agreements with the Navy and Plaintiffs' allegations.  ECF No. 19 at 27–28.  They claim that Kapilina "carried out a duty or task of the Navy and was required to supply water to the residences through the system that is owned and controlled by the Navy," which supplied contaminated water that led to Plaintiffs' forcible eviction.  *Id.* at 28.  Plaintiff counters that Defendants' contracts with the Navy do not establish the requisite causal nexus because Defendants were responsible for the transfer of the contaminated water from the Navy's delivery point to the residences and Defendants, not the Navy, were responsible for providing safe housing.  ECF No. 20 at 6–8.

"To demonstrate a causal nexus, the private person must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiff's claims against it." *County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 755 (9th Cir. 2022) (citation omitted). The "causal nexus analysis 'focuses on whether [the defendant] was involved in an effort to assist, or to help carry out, the duties or tasks of [a] federal superior.'" *Lake*, 14 F.4th at 1004 (alterations in original) (citation omitted); *see Saldana*, 27 F.4th at 684 ("A person or entity who acts under a federal officer or agency is one 'who lawfully assist[s]' a federal officer 'in the performance of his official duty' and is 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law.'" (alterations in original) (some internal quotation marks and citation omitted)). The relationship between the federal officer and one acting under the officer "typically involves subjection, guidance, or control" but it must extend "beyond simply complying with the law" even if the law is "highly detailed and the private firm's activities are highly supervised and monitored." *Lake*, 14 F.4th at 1004 (internal quotation marks, alteration, and citations omitted). Section 1442(a)(1) does not authorize removal merely "because a federal agency 'directs, supervises, and monitors a company's activities in considerable detail.'" *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1100 (9th Cir. 2018) (citation omitted).

8

Defendants insist that they satisfy the causal nexus requirement because they carried out the Navy's duty to manage and maintain the subject housing community — including the provision of water — and were required to supply water to the residences through the Navy's system. ECF No. 19 at 27–28. But there is no evidence suggesting that the Navy has a duty to or would itself manage, maintain, and lease the property were Defendants not involved. *See*, *e.g.*, *Allstate Ins. Co. v. S. Cal. Edison Co.*, CV 21-4994 MWF (Ex), 2021 WL 5356633, at *7 (C.D. Cal. Nov. 15, 2021) ("[T]he Court is not convinced that the federal government would have had to supply electricity to the Forest themselves in the absence of SCE's service. If SCE's services were unavailable, the government could simply contract with a different provider."). Indeed, Kapilina's predecessor in interest entered into the Ground Lease and later assigned the Ground Lease to Kapilina. ECF Nos. 19-4, 19-6. Kapilina — with GREP's assistance — leases and maintains the Kapilina Beach Homes residences. However, it does not carry out the Navy's duties by doing so. *Cf. Lake*, 14 F.4th at 1005 ("Merely leasing housing to a servicemember cannot itself be a governmental function, since [housing allowance] can be used on or off a military base. Otherwise, every private housing (or other service) provider that leases to a servicemember would perform a governmental function.").

Moreover, although Kapilina obtained the contaminated water from the Navy through the Utility Sales Agreement,[1] the Navy did not direct Defendants to supply the contaminated water to Kapilina Beach Homes or otherwise control Defendants' provision of water and other utility services.[2] ECF No. 19-3. The Utility Sales Agreement actually disclaims the Navy's responsibility altogether once Kapilina receives the water:

> The delivery point is the physical location up to which NAVFAC HI utility services are provided to [Kapilina]. . . . The "Delivery Point" represents the delineation of responsibility between the [Navy] and [Kapilina]. Parties are responsible for the maintenance, repair and operation of the utility system on their respective side of the delineated delivery point. The [Navy] is responsible on the line side of the utility system up to the Delivery Point. [Kapilina] is responsible for the remainder of the utility system.

*Id.* at 1–2. This directly contradicts Defendants' argument that they acted pursuant to a federal directive. At the hearing, defense counsel selectively cited a portion of

---

[1] Plaintiff refutes Kapilina's obligation to acquire water from the Navy, arguing that the Ground Lease authorized Kapilina to obtain utilities from sources other than the Navy. ECF No. 20 at 9. While this may be true, *see* ECF No. 19-4 ¶ 19, the Utility Sales Agreement is the salient contract for the causal nexus inquiry because it post-dates the Ground Lease and Assignment and memorializes Kapilina's decision to purchase utilities, including water, from the Navy. ECF No. 19-3. So Kapilina was in fact required to obtain water from the Navy, even though this does nothing to advance Defendants' contention that they acted under the Navy due in part to the compulsory purchase.

[2] The Utility Sales Agreement "is for the sale of electricity, potable water and wastewater utility *services*." ECF No. 19-3 at 1 (emphasis added).

the Utility Sales Agreement to suggest that there was mandatory direction from the Navy. *Id.* at 1 (Kapilina "shall receive the utility service at the Delivery Point and provide payments to the [Navy] as described below.  The [Navy] shall deliver services from October 1, 2012 until such time as Lease . . . expires or is terminated, or until such time that the subject utility system is transferred or otherwise disposed of[.]").  However, this disregards the relevant and controlling portion of the agreement cited above, which shows that Defendants exclusively controlled the water and utilities systems from the delivery point on.  And in any event, the mandatory language relied upon by Defendants merely shows that the Navy controlled utility services, such as water, *up to the delivery point*.  *Id.*

While contaminated water is an overarching issue and Plaintiffs point to the Navy as the source of the water contamination, their claims against Defendants primarily concern Defendants' alleged failure to provide habitable residential housing, namely clean and safe water.  ECF No. 1-4 at 7–16.  The Navy had no involvement in or control over Defendants' actions as a landlord and property manager.  For example, Plaintiffs accuse Defendants of wrongful eviction, but the Navy clearly did not direct that, and defense counsel conceded as much at the hearing.

Defendants rely heavily on Plaintiffs' strict liability claim to show a federal connection and/or mandate.  Plaintiffs allege that Defendants were within the chain

11

of distribution of the contaminated water and are therefore strictly liable for the harms resulting from distributing and selling an unsafe product to Plaintiffs.  ECF No. 1-4 ¶¶ 72–73.  At the hearing, defense counsel argued that Plaintiffs blame the Navy, not Defendants, for contaminating the water, and because the Navy contaminated the water and controlled its distribution through the Utility Sales Agreement, Defendants were merely acting pursuant to the Navy's direct/explicit/mandatory direction.  But per the plain language of the Utility Sales Agreement, there was no federal mandate regarding the distribution of the water.  And a federal interest or connection cannot alone establish the requisite causal nexus.  Therefore, Defendants have not shown that the Navy controlled or directed the actions Plaintiffs challenge.  *See Lake*, 14 F.4th at 1004–05 (finding no causal nexus because the defendants failed to meet the "central issue" in the analysis — "whether a federal officer directed the defendant to take the action challenged," i.e., whether the Navy controlled the decision to disclose pesticide contamination (citation omitted)).

      **B.**    **Colorable Federal Defense**

Even if Defendants demonstrated a causal nexus, they could not establish the propriety of removal under § 1442(a)(1) because they fail to assert a colorable federal defense.  Defendants argue that they have two colorable federal defenses:

the government contractor defense and derivative sovereign immunity.  ECF No. 19 at 30–38.  Neither is colorable.

Defendants are not required to prove that their federal "defense is in fact meritorious" at this stage.  *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014); *see Mesa v. California*, 489 U.S. 121, 128–29 (1989).  This is because "a defendant invoking § 1442(a)(1) 'need not win his case before he can have it removed.'"  *Leite*, 749 F.3d at 1124 (citation omitted).  All that Defendants "must prove by a preponderance of the evidence is that [their] . . . defense is 'colorable.'"  *Id.* (citation omitted).

### 1. Government Contractor Defense

The Supreme Court has articulated the following standard for the government contractor defense:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *see Leite*, 749 F.3d at 1123 (requiring, in the failure to warn context, that (1) the government exercised its discretion and approved certain warnings for the defendant's products; (2) the defendant provided the warnings required by the government; and (3) the defendant warned the government about hazards known to the defendant but not to

13

the government (citations omitted)).  In the Ninth Circuit, however, this defense "is only available to contractors who design and manufacture military equipment." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 731 (9th Cir. 2015) (internal quotation marks omitted) (quoting *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746 n.1 (9th Cir. 1997)).  At the hearing, defense counsel acknowledged this limitation yet maintained that the defense applies because Defendants contracted with the Navy, which designed and contaminated the water delivered to the residential community.  But this is not the applicable standard.  Defendants are plainly excluded from the class of contractors who may avail themselves of the government contractor defense because they do not design and manufacture military equipment.

### 2. Derivative Sovereign Immunity

Defendants also contend that derivative sovereign immunity is a colorable defense.  ECF No. 19 at 36–38.  The Ninth Circuit has held that derivative sovereign immunity established by *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), "'is limited to cases in which a contractor had no discretion in the design process and completely followed government specifications,' and does not extend to 'military contractors exercising a discretionary governmental function.'" *Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1097 (9th Cir. 2022) (some internal quotation marks omitted) (quoting *Cabalce*, 797 F.3d at 732); *see*

14

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016), *as revised* (Feb. 9, 2016) (explaining that derivative sovereign immunity applies when a defendant's work "was all authorized and directed by the Government of the United States" and "performed pursuant to the Act of Congress" (internal quotations marks and citation omitted)).  "Critical in *Yearsley* was . . . the contractor's performance in compliance with all federal directions."  *Campbell-Ewald*, 577 U.S. at 167 n.7.  A private person does not "acquire the Government's embracive immunity" merely by "performing Government work."  *Id.* at 166.

      The Court already determined that Defendants did not act at the Navy's direction.  Although the Utility Sales Agreement obligated Defendants to purchase water from the Navy, the Navy did not supervise or control Defendants, and actually disclaimed responsibility beyond the point of delivery.  Defendants exercised discretion with respect to the subsequent delivery of water to the residents, as well as the actions taken in response to the water contamination.  *See Cabalce*, 797 F.3d at 732.

      For these reasons, despite the Court's broad interpretation of § 1442 in favor of removal, Defendants' asserted facts fail to establish a causal nexus or colorable federal defense.  Removal under the federal officer statute was accordingly improper.  *See Lake*, 14 F.4th at 1005 (noting that the defendants failed to meet at least one requirement for removal under the federal officer removal statute).

15

**II.    CAFA**

Defendants also invoked CAFA as a ground for removal.  Plaintiff does not challenge Defendants' removal under CAFA.  However, she requests leave to conduct jurisdictional discovery regarding the putative class members' citizenships to ascertain whether there is a mandatory or discretionary basis to remand.  ECF No. 20 at 2.

CAFA confers district courts with original jurisdiction over civil actions involving amounts in controversy exceeding "$5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A); *see also Adams v. W. Marine Prods., Inc.*, 958 F.3d 1216, 1220 (9th Cir. 2020).  Defendants allege that there are at least 100 proposed class members — and likely close to 4,000 — and that the aggregate amount in controversy exceeds $5,000,000.  ECF No. 1 at 5–8.

With respect to their citizenships, Defendants aver that:  (1) Kapilina is a citizen of Hawaiʻi, because it was incorporated in and has its principal place of business in Hawaiʻi and (2) GREP is a citizen of Delaware, where it was incorporated, and Arizona, where it has its principal place of business.  ECF No. 1 at 9; ECF No. 19 at 17–19.  Although an LLC ordinarily shares the citizenships of all of its owners/members in diversity cases, *see Johnson v. Columbia Props.*

16

*Anchorage, LP*, 437 F.3d 894, 899, 902 (9th Cir. 2006), courts treat LLCs as unincorporated associations under CAFA, so they are citizens of the states under whose laws they are organized and the states where they have their principal places of business. *See* 28 U.S.C. § 1332(d)(10); *Ramirez v. Carefusion Res., LLC*, Case No.: 18-cv-2852-BEN-MSB, 2019 WL 2897902, at *2 (S.D. Cal. July 5, 2019) ("In the Ninth Circuit, whether an LLC is 'an unincorporated association' for CAFA purposes under § 1332(d)(10) remains an open question. Nonetheless, the Fourth Circuit" has "expressly held that an LLC is properly considered an 'unincorporated association' within the meaning of § 1332(d)(10)" and "most courts to consider the issue have reached the same conclusion, finding that § 1332(d)(10) applies to all types of non-corporate business entities." (citations omitted)); *Jack v. Ring LLC*, 553 F. Supp. 3d 711, 714–16 (N.D. Cal. 2021).

Defendants argue that minimal diversity exists because at least one member of the proposed plaintiff class is a citizen of a state other than Hawaiʻi, Delaware, or Arizona. ECF No. 19 at 21–22; ECF No. 1 at 9–11. Notwithstanding CAFA's minimal diversity requirement, *see* 28 U.S.C. § 1332(d)(2)(A), there are two exceptions to CAFA jurisdiction: "(1) the local controversy exception and (2) the home state exception." *Adams*, 958 F.3d at 1220. The Ninth Circuit treats these non-jurisdictional exceptions as a form of abstention. *See id.* at 1223.

17

Pursuant to the local controversy exception, "a district court 'shall' decline to exercise jurisdiction when more than two-thirds of the putative class members are citizens of the state where the action was filed, the principal injuries occurred in that same state, and at least one significant defendant is a citizen of that state." *Id.* at 1220 (citing 28 U.S.C. § 1332(d)(4)(A)).  The home state exception consists of mandatory and discretionary components:

> Under the first, the district court "shall" decline to exercise jurisdiction where "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."  28 U.S.C. § 1332(d)(4)(B) (the "mandatory home state exception").  Under the second, a district court "may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction" when more than *one-third* of the putative class, and the primary defendants, are citizens of the state where the action was originally filed.  28 U.S.C. § 1332(d)(3) (the "discretionary home state exception").

*Id.*  It appears that only the local controversy exception could potentially apply because GREP is not a citizen of Hawaiʻi.

"Once CAFA jurisdiction has been established, the burden falls on the party seeking remand . . . to show that an exception to CAFA jurisdiction applies." *Adams*, 958 F.3d at 1221 (citing 28 U.S.C. § 1332(d)(2), (d)(5)) (other citation omitted).  The movant "must provide *some* facts in evidence from which the district court may make findings regarding class members' citizenship" to satisfy

this burden. *Id.* (internal quotation marks and citation omitted); *see also Mondragon v. Cap. One Auto Fin.*, 736 F.3d 880, 884 (9th Cir. 2013).

Plaintiff requests leave to conduct jurisdictional discovery regarding the putative class members' citizenships. To ascertain what portion of members are citizens of Hawaiʻi, and in turn whether any of the foregoing exceptions apply, Plaintiff needs to obtain discovery regarding the members' citizenships. *See Mondragon*, 736 F.3d at 885 (instructing the district court, on remand, to allow the plaintiff "to renew his motion to remand and to take jurisdictional discovery tailored to proving that more than two-thirds of the putative class are citizens of California"); *Clayborne v. Chevron Corp.*, No. 19-CV-07624-JSW, 2020 WL 11563098, at *3 (N.D. Cal. Feb. 5, 2020) (allowing the plaintiff "to take discovery for the purposes of investigating whether more than two-thirds of the putative class are citizens of California"). The Court grants Plaintiff's request to conduct jurisdictional discovery. Discovery shall be limited to information concerning the putative class members' citizenships, and should be tailored as narrowly as possible to obtain the necessary information. If Plaintiff wishes to seek remand based on an exception to CAFA jurisdiction after the completion of discovery, she may file a renewed motion to remand.

## CONCLUSION

For the reasons stated herein, the Court GRANTS IN PART Plaintiff's Motion for Remand. ECF No. 12. The Court GRANTS the Motion to the extent that the federal officer removal statute does not support removal and GRANTS Plaintiff's request for limited jurisdictional discovery.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, June 16, 2022.



Jill A. Otake
United States District Judge

Civil No. 22-00052 JAO-WRP, *Lethgo v. CP IV Waterfront, LLC, et al.*; ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR REMAND